**UNITED STATES of America ex rel.
Solomon HARDING**

v.

**Ronald MARKS, Supt.**

**Civ. A. No. 74–3006.**

United States District Court,
E. D. Pennsylvania.

Nov. 14, 1975.

John H. Lewis, Jr., Philadelphia, Pa., for plaintiff.

Bonnie Brigance Leadbetter, Asst. Dist. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

CLIFFORD SCOTT GREEN, District Judge.

## I. FACTS

Before the Court is a petition for a writ of habeas corpus brought by relator, a state prisoner. Relator argues that he was deprived of his constitutional right of due process of law by the instructions of the trial court to the jury in his criminal trial.

In instructing the jury, the trial judge made comments, unsupported by the evidence, which were unfairly prejudicial to relator. However, relator's counsel failed to object and thus did not comply with Rule 1119(b) of the Pennsylvania Rules of Criminal Procedure, which states that: "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate. . . ." On January 10, 1972, the jury returned a verdict of guilty of forcible rape and assault and battery. Following the denial of general motions for a new trial and arrest of judgment, relator was sentenced on May 25, 1972, to a term of imprisonment of ten to twenty years[1]. Relator appealed to the Superior Court of Pennsylvania on June 20, 1972 assigning as error the instruction of the trial court. The Superior Court affirmed *per curiam* and without opinion on April 4, 1973. Relator then filed a petition with the Supreme Court of Pennsylvania on August 27, 1973 to allow on appeal *nunc pro tunc;* this petition was denied allocatur on September 9, 1974. Relator then filed his *pro se* petition for a writ of habeas corpus in this Court on November 22, 1974, and counsel was appointed thereafter.

On February 20, 1975, we entered an Order directing the District Attorney of Philadelphia to file an amended answer to the petition for writ of habeas corpus specifically addressed to the questions of whether relator has exhausted the state court remedies under the applicable rules and whether there presently exists an available state court remedy for relator to pursue. On March 10, 1975, the District Attorney responded to the Order by saying ". . . relator was allowed leave to file a petition for allowance of appeal *nunc pro tunc.* The court then denied allocatur as though the petition had been timely filed. Therefore, since relator raised the issues he raises herein in his appeal to the Superior Court and the Supreme Court subsequently denied allocatur, he has exhausted all available state court remedies."

We issued a Memorandum and Order on April 11, 1975 in which we concluded that the record before us was adequate for resolution of relator's constitutional claims. Nevertheless, we granted both sides leave to file a motion for reconsideration. The Commonwealth responded by letter dated April 29, 1975, with arguments which in effect expatiated upon its previous arguments—to wit, by not taking exception to the trial court's charge at the time of trial, relator "waived" his right to allege prejudicial error as to the charge and therefore he is precluded from raising the claim in this federal habeas corpus proceeding; and the purported error was not prejudicial within the context of the total charge.

We orderd a hearing for September 4, 1975 to afford the parties an opportunity to offer evidence and to be heard on oral argument. The only evidence offered was a stipulation stating:

". . . relator did not discuss the court's charge to the jury with his attorney during trial and therefore . . . he did not participate in counsel's decision to any portion of the charge."

■ Relator has satisfied all the prerequisites for invoking the habeas corpus jurisdiction of this Court[2].

---

1. At post trial argument, preceding sentencing, counsel took no exception to the charge and did not find anything in the record upon which he could predicate an argument for a new trial and so informed the court. Transcript, May 25, 1972, p. 2.

2. Relator is "in custody" within the meaning of 28 U.S.C. § 2241 since he is being held in

Therefore, the record before us is adequate for the resolution of the waiver issue and relator's constitutional contention.

In regard to the issue of waiver, we conclude that relator has not waived his right to allege constitutional error as to the trial judge's charge. As to relator's constitutional claim, we conclude that the trial judge's charge was so unfairly prejudicial that it denied relator a fair trial and, therefore, was violative of constitutional due process.

## II. WAIVER ISSUE

■■ The Commonwealth argues, on the one hand, that relator has committed a wavier by not raising his claim at trial but, on the other hand, states that it does not raise any question as to a "by-pass of state court remedies", thereby suggesting that a distinction is to be made between waiver and deliberate by-pass. Regardless of whether labeled "by-pass" or "waiver" the applicable standard is set forth in *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). There, the Supreme Court held that a "federal habeas judge may in his discretion deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts . . . ." 372 U.S. at 438, 83 S.Ct. at 848. *See also, Lefkowitz v. Newsome*, 420 U.S. 283, 95 S.Ct. 886, 891, n. 9, 43 L.Ed.2d 196 (1975). Thus we may deny relief only if we find that relator deliberately by-passed the orderly procedure of the state court [3].

■■ In support of its waiver, or deliberate by-pass, contention, the Commonwealth relies principally upon *Henry*

Graterford Prison. His petition for a writ of habeas corpus alleged that this custody was in violation of the laws of the United States. 28 U.S.C. § 2241(c)(3). And he has satisfied the exhaustion requirement of 28 U.S.C. §§ 2254(b), (c) since there were no state remedies of which relator could have availed himself at the time of the filing of his habeas corpus petition. See *Francisco v. Gathright*, 419 U.S. 59, 95 S.Ct. 257, 42 L.Ed.2d 226 (1974). Also, in our Memoran-

*v. State of Mississippi*, 379 U.S. 443, 85 S.C. 564, 13 L.Ed.2d 408 and *U. S. v. Harris*, 498 F.2d 1164 (3rd Cir. 1974) *cert. den.* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1975). These cases, however, are factually distinguishable from relator's case on the basis that they presented a factual pattern from which one could reasonably abstract an issue of waiver. It is clear from the facts of the instant action that waiver simply is not in issue. For, in writing the majority opinion in *Fay v. Noia, supra*, Mr. Justice Brennan states that the classic definition of waiver enunciated in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, "furnishes the controlling standard" in federal habeas corpus. *Fay v. Noia*, 372 U.S. at 439, 83 S.Ct. at 849. *Johnson v. Zerbst, supra*, defines waiver as "an intentional relinquishment or abandonment of a known right or privilege". 304 U.S. at 464, 58 S.Ct. 1023. In conjunction with this definition of waiver, the following remarks by Mr. Justice Brennan are of critical importance to the instant action:

> At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner. . . . A choice made by counsel not participated in by the petitioner does not automatically bar relief. . . . [W]aiver affecting federal rights is a federal question. (cases omitted)

Further, *Henry v. State of Mississippi, supra*, 379 U.S. at 452, 85 S.Ct. at 570, one of the primary cases relied upon by the Commonwealth, states that the burden is on the Commonwealth to prove waiver:

dum and Order of April 11, 1975, *supra*, we concluded that there is no issue of exhaustion of state remedies in this action; and the Commonwealth and relator's counsel conceded at the evidentiary hearing that exhaustion of state remedies is not in issue.

3. It should be noted that waiver and deliberate by-pass are interchangeable concepts within the context of habeas corpus. *See Fay v. Noia, supra; Lefkowitz v. Newsome, supra.*

Only evidence extrinsic to the record before us can establish the fact of waiver, and the State should have an opportunity to establish that fact.

The only evidence before us which goes to the Commonwealth's waiver argument is the stipulation entered into by the Commonwealth and relator's counsel at the evidentiary hearing on September 4, 1975. Rather than supporting the Commonwealth's waiver argument, the stipulation undercuts it. It shows that relator did not participate in his counsel's decision to forego objection to the trial court's charge to the jury and, indeed, that relator did not exercise any choice in the matter at all. As the Commonwealth has failed to produce any evidence of a waiver, we are compelled to find that it has not met its burden of proof. Therefore, we conclude that an issue of waiver cannot reasonably be abstracted from the factual pattern placed before us.

■■■ There is an even more compelling basis for us to conclude that the factual pattern before us does not reasonably present an issue of waiver. Even though counsel for relator did not take exception to the trial court's instructions as required by Pa.R.Cr.P. 1119(b) at all times pertinent hereto, Pennsylvania courts have applied the so-called rule of *Commonwealth v. Williams,* 432 Pa. 557, 248 A.2d 301 (1968), which states that a Pennsylvania appellate court would review "such basic and fundamental errors as, in view of the entire record, require . . . [the conclusion] that one accused of a crime has been deprived of a fair and impartial trial", notwithstanding the fact that such error had not been raised below. *Commonwealth v. Jennings,* 442 Pa. 18, 26, 274 A.2d 767, 771 (1971). *See also, Commonwealth v. Miller,* 448 Pa. 114, 290 A.2d 62 (1972).

The Pennsylvania Supreme Court has recently abrogated the rule of *Commonwealth v. Williams* for both civil and criminal cases. *Commonwealth v. Clair,* Pa., 326 A.2d 272 (1974) (criminal); *Dilliplaine v. Lehigh Valley Trust Company,* Pa., 322 A.2d 114 (1974) (civil). In abrogating the rule, the court recognized that Justice Roberts in his dissenting opinion in *Commonwealth v. Williams* adequately described the situation as it existed under said rule despite the presence of Pa.R.Cr.P. 1119(b). Justice Roberts' description is quoted in *Commonwealth v. Clair,* 326 A.2d at 273 as follows:

The majority now—contrary to the whole course of modern trial procedure —encourages defense counsel to sit by silently without calling errors to the trial court's attention until after the guilty verdict is returned. In effect the majority's present approach places the appellate court in the role of a super-trial-defense counsel. Where counsel fails to call errors to the attention of the trial judge, the majority ignores that deficiency and assumes the function of protecting those failures by granting relief despite the silence of counsel at trial.

The facts of the case before us show that relator's counsel did exactly what Justice Roberts said could be done under the rule of *Commonwealth v. Williams* [4] —to wit, he sat by silently without calling errors to the trial court's attention. It is clear, then, that there was no waiver, or deliberate by-pass, of any of relator's constitutional claims; there was merely resort to an alternative route for assertion of said claims.

Accordingly, the expectations surrounding relator's situation are not dissimilar to those surrounding petitioner's situation in *Lefkowitz v. Newsome,* 420

---

4. The date of action by the Superior Court in the instant case (April 4, 1973) predates even the earlier civil decision by the Pennsylvania Supreme Court. The action by the Pennsylvania Supreme Court in the instant case (September 9, 1974) predates its decision in *Commonwealth v. Clair.* Thus, on September 9, 1974, the rule, that an appellate court would review basic and fundamental error, not objected to below, was still the law of Pennsylvania in criminal cases. *See, Commonwealth v. Keppel,* 231 Pa.Super. 22, 326 A.2d 593, 597 n. 3 (1974) (Hoffman, J., dissenting).

U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975). In that case, at the time petitioner entered a guilty plea, New York law provided for appellate review of alleged coerced confessions and of the admissibility of evidence allegedly seized improperly; notwithstanding the general New York rule that a guilty plea, intelligently and voluntarily made, bars subsequent assertion of constitutional challenges to the pretrial proceeding. The Court held that because the state permitted appeal of petitioner's constitutional claims, petitioner's ". . . plea [of guilty] carried with it the guarantee that judicial review of his constitutional claims would continue to be available to him." *Id.*, at 890. Likewise, because Pennsylvania permitted appeal of alleged constitutional, or fundamental, error not raised during trial, relator's failure to raise an objection to the trial court's charge carried with it the guarantee that judicial review of his constitutional claims would continue to be available to him. As the court in *Lefkowitz v. Newsome* further remarked: "To deny federal habeas corpus relief to those in Newsome's position would make New York's law a trap for the unwary." *Id.*, at 891. Therefore, we find that on the basis of the facts before us, relator did not waive, or by-pass, his constitutional claims.

■■ Even if the facts before us did raise an issue of waiver, we would still be compelled to rule in favor of relator on said issue. For, it is well established that where the state courts consider or "entertain" petitioner's constitutional claims on the merits at any point during post-conviction proceedings, the state is precluded from relying on the waiver, or by-pass, rule and the federal courts have no discretion to deny habeas relief to which petitioner is otherwise entitled. *Lefkowitz v. Newsome*, 420 U.S., at 283, 95 S.Ct., at 891, n. 9, 43 L.Ed.2d 196 (1975); *Warden v. Hayden*, 387 U.S. 294, 297 fn. 3, 87 S.Ct. 1642, 1645 fn. 3, 18 L.Ed.2d 782, 786 fn. 3 (1967);

*United States ex rel. Brown v. Russell*, 318 F.Supp. 76 (E.D.Pa.1970). The fact that the Supreme Court of Pennsylvania entertained relator's appeal alleging constitutional error, and the fact that it rendered a decision thereon by denying allocatur on relator's petition "as though the petition had been timely filed",[5] leads us to conclude that a decision on the merits was reached, even though not accompanied by an opinion. Cf. *United States ex rel. Brown v. Russell, supra* (decision by a judge without opinion in favor of the Commonwealth pursuant to the Post-Conviction Hearing Act was deemed to be on the merits). Under these circumstances, we decide that as a matter of law the Commonwealth cannot rely upon the waiver, or by-pass, rule.

### III. DUE PROCESS ISSUE

Relator attacks the trial judge's charge to the jury as being prejudicial and, hence, violative of the Due Process Clause of the Fourteenth Amendment. In support of this general allegation, relator contends, in part, that the trial judge unfairly reviewed the evidence and "seriously prejudiced . . . [him] and contributed to the conviction by ridicule and implication to the jury that the petitioner had committed other crimes and was unworthy of belief."

We are most cognizant of the fact that this case involves the undisputed commission of a heinous crime and wrong to the victim. Moreover, it is obvious that the evidence produced at trial is sufficient to support the jury verdict. However, it is also clear that the jury, in order to return its verdict of guilty, had to resolve critical and disputed questions involving the accuracy and reliability of two issues—identification and credibility. In short, the question of the guilt or innocence of the defendant involved the sensitive and sensible appraisal of the facts in evidence and the inferences therefrom, a task and function peculiarly that of the jury under our system of criminal jurisprudence.

5. Commonwealth's letter dated March 10, 1975.

In assessing whether erroneous chages were sufficiently prejudicial to violate a defendant's due process rights, we must consider, within the context of the entire trial, the probable impact of such charges on the jury. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Cool v. United States,* 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972). We also recognize that "errors committed during the trial of a criminal case in the state court are not subject to review in a habeas corpus proceeding in a federal court unless it is shown that the errors were so conspicuously prejudicial as to deprive the defendant of a fair trial." *U. S. ex rel. Cannon v. Maroney,* 373 F.2d 908, 910 (3rd Cir. 1967).

We have carefully reviewed the entire state court trial record and conclude that the impact of the unfairly prejudicial comments by the trial judge, in instructing the jury, deprived relator of a fair trial as guaranteed by the Fourteenth Amendment right to due process of law. Indeed, the trial record permits no other finding.

The trial record clearly shows that the trial court weighted the charge heavily in favor of the Commonwealth and against the defendant. This is indicated by the fact that: (1) the instructions of the trial judge contain statements regarding other criminal conduct on the part of relator, notwithstanding the fact that there is not one iota of evidence in the entire record to support such statements; [6] (2) the trial judge made comments which undermined relator's attempt to impeach the prosecutrix, the only witness who clearly identified relator; (3) the court misstated the testimony of a Commonwealth witness, Mr. Carroll. The balance of this memorandum is devoted to a more detailed review and analysis of the trial court's instructions.

### A. Misstatements Regarding Prior Criminal Conduct

We note that the major thrust of relator's charge of denial of due process relates to the court's statement to the jury that relator had committed other crimes. The issue of identification was the major issue at the trial. The prosecutrix, after identifying relator as her assailant, testified that on the evening of the attack, he wore ". . . a blue knitted hat. . . ." [7] Also, a Commonwealth witness, Mr. Carroll, testified that although he had gone to the assistance of the prosecutrix, he did not get a good look at the assailant's face; however, he testified that the assailant ". . . had a blue-sailor type,—a naval type of hat on, wool and that is about all I can remember." [8] The Commonwealth's identification evidence was countered by the testimony of relator, his mother, and his wife, all of whom testified that relator had never worn a hat of any kind in recent years. Thus, the evidence that relator had never worn a hat was a major issue which relator sought to have the jury evaluate in determining whether or not there was a misidentification.

The judge not only instructed the jury that he did not know the significance of testimony concerning relator never having worn a hat, but also made statements

6. In this regard it is significant to note the following remarks made by Chief Justice Warren in his dissenting opinion in *Spencer v. Texas,* 385 U.S. 554, 572–574, 87 S.Ct. 648, 658–659, 17 L.Ed.2d 606 (1967):
   [I]t is well established that evidence of prior convictions may not be used by the State to show that the accused has a criminal disposition and that the probability that he committed the crime currently charged is increased. While this Court has never held that the use of prior convictions to show nothing more than a disposition to commit crime would violate the Due Process Clause of the Fourteenth Amendment, our decisions exercising supervisory power over criminal trials in federal courts, as well as decisions by courts of appeals and of state courts, suggest that evidence of prior crimes introduced for no purpose other than to show criminal disposition would violate the Due Process Clause. (Footnotes omitted)

7. Transcript, January 7, 1972, page 8.

8. Transcript, January 6, 1972, page 8.

that relator had committed other crimes. The comment of the court was as follows: "Now members of the jury, there was testimony that the defendant never wears a hat, or may, *or may never wear a hat except when he is going out to rob a bank or never wears a hat unless he is going ice skating, or never wears a hat unless he is going out to commit some crime, or whatever. So what significance that has, I don't know you must say.*"[9] There is not one word of evidence in the entire record to support the trial court's comment concerning relator's robbing a bank or committing any prior crime.

Certainly, the impact of the unwarranted comment by the trial judge undermined the defense of misidentification and wrongfully portrayed relator to the jury as a person with a criminal record. Under these circumstances, the court's prior instructions to the jury that they were "the final arbiters of the facts" and that their "remembrance of the facts controls" was insufficient to remove the impact of the unfairly prejudicial remarks; indeed, no instruction could have cured this devastating comment. *See, Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Nor is there any merit to the suggestion made by counsel for the Commonwealth, at oral argument, that the impact was not great, because the remarks were apparently made merely in jest. Certainly, a criminal trial, where the defendant faces the loss of liberty, is not the place for the trial judge to resort to humor, at the expense of the defendant. Clearly, it was not considered a humorous matter to the trial judge at the time of sentencing when he imposed a sentence of 10 to 20 years of imprisonment upon relator.

The United States Court of Appeals for the Third Circuit, en banc, recently decided that a defendant was deprived of a fair trial when a prosecuting attorney inquired of the defendant on cross-examination whether he had committed a prior crime. *United States of America v. Gray*, 468 F.2d 257 (3rd Cir. 1972). The Court granted the defendant a new trial, notwithstanding the fact that he could have been impeached by being asked if he had been convicted of the crime and notwithstanding the fact that the jury was instructed to disregard the improper question immediately after said question was asked. The Court expressed the view that cautionary instructions by the trial court were ineffective to erase from the minds of the jury the effects of advising the jury of the criminal background of the defendant. Of course, it is even more serious where, as here, such comments do not have a basis in fact.

The unfair prejudice to the defendant is even greater when the improper comment is made by the trial judge. The impact of a trial judge's comments to a jury is eloquently described by Chief Justice Hughes in *Quercia v. United States*, 289 U.S. 466, 469–71, 53 S.Ct. 698–99, 77 L.Ed. 1321 (1933):

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination. . . .

> This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. *In*

9. Transcript, January 7, 1972, page 175. (emphasis added)

*commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided'; that 'deductions and theories not warranted by the evidence should be studiously avoided.' He may not charge the jury 'upon a supposed or conjectural state of facts, of which no evidence has been offered' . . . Similarly, where no testimony had been offered as to the previous character of the accused, it was prejudicial error for the trial court to comment unfavorably upon his general character.*

(Citations omitted and emphasis added).

█ The improper statement by the trial judge, concerning criminal conduct on the part of the defendant, is sufficient, standing alone, to support the finding that relator was denied his constitutional right to a fair trial as guaranteed by the Fourteenth Amendment. Nevertheless, we have carefully reviewed the entire record to determine if the improper remarks were nullified or reduced in impact by other parts of the record. The review clearly discloses that other comments by the trial court and the instructions, as a whole, were weighted heavily in favor of the government, against relator, and added to the prejudice suffered by relator. We set out, by

way of example only, two other seriously prejudicial comments by the trial judge.

### B.   Misstatement Regarding Prior Inconsistent Identification Statement

Defendant sought to show a misidentification and also to impeach the credibility of the prosecutrix by showing a prior inconsistent statement on the issue of identification. Relator and his wife testified to a chance meeting between them and the prosecutrix where, in response to a question asked by relator's wife, the prosecutrix stated, "I never said he raped me." [10] The prosecutrix testified in rebuttal [11]:

Q. Now, you heard his wife testify that one day on Susquehanna Avenue, she and her husband crossed over the street and had a conversation with you, at which time you said, in her words, you said, 'I never said it was Solomon Harding,' or words to that effect. Did that ever take place?

A. No.

Thus, it is clear that the prosecutrix positively denied that any such conversation took place. She did not admit the conversation and then attempt to explain it; rather, she specifically denied the occurrence. However, in charging the jury, the trial judge commented on this particular aspect of the evidence as follows: [12]

Did she say to him, 'I never identified you?' and if she did, does that mean in fact that she did not identify him? What would be her reason, if any, for saying so? Was she frightened?

Clearly, the issue was sharply defined by the conflicting testimony; did the meeting and conversation described by relator and his wife occur, or did it not occur as testified by the prosecutrix? The question posed by the trial judge to the jury—"Was she frightened?"— suggested to the jury that even if relator and his wife were believed, and the

10.  Transcript, January 7, 1972, p. 126.

11.  Transcript, January 7, 1972, pp. 134, 135.

12.  Transcript, January 7, 1972, p. 174.

prosecutrix disbelieved, as to the conversation taking place, the jury could find the statement a product of her fright. The record is devoid of any evidence to support the trial court's suggestion that the alleged prior inconsistent statement resulted from fright on the part of the prosecutrix. This explanation, provided by the court, but not testified to by the prosecutrix, completely undermined the attempt of relator to impeach the credibility of the prosecutrix by showing a prior inconsistent statement.

*C. Misstatement Regarding An Eyewitness' Testimony*

The final example of misstatement by the court concerns the testimony of the Commonwealth's other eyewitness to the incident, Mr. Carroll. In commenting on the testimony of Mr. Carroll, the trial court stated: [13]

Mr. Carroll said that he could not, due to the lighting on the porch, identify anyone, but that this defendant appeared to be of the same coloration, of the same height, of the same weight, of the same age.

Here, the court again misstated the evidence in favor of the Commonwealth and against the relator.

Mr. Carroll's actual testimony on direct examination concerning identification is as follows: [14]

Q. Sir, can you describe the physical appearance of the man you had the scuffle with?

A. I would say he is about five-eight, light-skinned. He had a blue sailor-type—a naval type of hat on, wool, and that is about all I can remember.

Q. Was this person a Negro or a white person?

A. Black.

Q. Do you remember any other article of clothing by color?

A. Probably a pair of dark pants— I am not too sure of that.

Q. Now, at any time did you get a really-really close look at the face of this person?

A. We were, like on the porch, and it was dark and there was a light—he had his back to the light and I was more or less looking—trying to look at him but the light was in my eyes, so I couldn't see with the glare.

Q. You couldn't see him too good?

A. No.

\* \* \* \* \* \*

Q. Now, can you approximate the weight of the person you had the scuffle with?

A. I would say about a hundred and sixty, possibly one-seventy.

Q. About a hundred and sixty or one-seventy?

A. Yes.

Q. Can you approximate the age of the person you had the scuffle with?

A. At the time it looked like he could have been about seventeen or eighteen, something like that.

Q. Now, sir, is there any one in the courtroom that you believe today is in fact the person you had the scuffle with?

A. Well, I couldn't be sure.

Q. Is there anyone who looks like the person?

Mr. Killeen: Objection

The Court: Overruled.

Q. Or similar in any way?

A. Possibly, I am not sure.

Q. Who would that person be?

A. The defendant, I believe.

Mr. Klein: Your Honor, may I have the defendant rise, please, so the witness can get a look at his size?

The Court: Yes.

The Witness: He looks something like him. I couldn't be sure.

\* \* \* \* \* \*

13. Transcript, January 7, 1972, p. 172.

14. Transcript, January 6, 1972, pp. 8, 9, 11–13.

Q. In what way, sir, is he similar or does he look like the man you had the scuffle with?

A. Just about the height, the complexion, that's all.

Q. What about the hair style?

A. Well, like I said he had on a blue knit type of hat.

Q. You cannot say that this defendant is definitely the man you had the fight with?

A. No.

\* \* \* \* \* \*

Finally on cross examination the witness testified:[15]

Q. You say the only description you could give of the man was that he had a blue hat on, a navy type blue hat, wool?

A. Right.

This uncertain testimony of Mr. Carroll concerning identification was clearly misstated in favor of the Commonwealth when the trial court advised the jury that Mr. Carroll testified that relator "appeared to be of the same coloration, of the same height, of the same weight, of the same age" as the assailant.

*D. Conclusion*

■ In *Donnelly v. DeChristoforo, supra,* Mr. Justice Rehnquist stated that the Supreme Court countenanced no retreat from the proposition established by a long series of decisions of the Supreme Court that the "Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence." [16] *A fortiori*, a conviction obtained by the trial judge's slanted misstatements, unsupported by any evidence, cannot be tolerated under the Fourteenth Amendment. We grant the writ of habeas corpus in accordance with the Order attached hereto.

### ORDER

And now, this 14th day of November, 1975, it is ordered that the Petition of Solomon Harding for a writ of habeas corpus is GRANTED, without prejudice to the right of the Commonwealth of Pennsylvania to retry relator provided such retrial commences within sixty (60) days of the date of this Order.

It is further ordered that the execution of this Order is stayed for a period of thirty (30) days or until thirty (30) days subsequent to final disposition of any appeal which may be taken from this Order.

15. Transcript, January 6, 1972, p. 18.  16. 94 S.Ct., at 1873.